# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Corey Scales, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 15 C 50038 |
| | ) | |
| FedEx Ground Package System, Inc., | ) | |
| | ) | |
| Defendant. | ) | Judge Frederick J. Kapala |

## ORDER

Defendant's motion for summary judgment [31] is granted. This case is closed.

## STATEMENT

Plaintiff, Corey Scales, has sued his former employer, FedEx Ground Package System, Inc. ("FedEx") alleging violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. FedEx has moved for summary judgment. For the reasons that follow, the motion is granted.

## I. FACTS[1]

Plaintiff began working at FedEx as a part-time package handler in October 2005. In January 2008, plaintiff was promoted to a part-time operations manager position requiring him to supervise package handlers. Plaintiff reported to Sort Manager Tim Olexa, who in turn reported to Station Senior Manager Jeremy Sword.

Throughout his employment, plaintiff was advised of and received training on: (1) the FedEx Ground Acceptable Conduct Policy-010, which prohibits comments or communications that reasonably could be viewed as discriminatory or that might constitute harassment or bullying; or that disparage, belittle, or demean employees; and (2) the FedEx Ground Anti-Harassment & Anti-Discrimination Policy-020, which prohibits harassment that creates a hostile, intimidating, or offensive working environment and prohibits any act that creates the potential for harassment, including sexual harassment or harassment based on any other protected characteristic as well as inappropriate conduct that is harassing in nature but does not rise to the level of being unlawful.

Plaintiff's personnel records include the following disciplinary history. On November 26, 2008, plaintiff received a written warning and counseling because he failed to conduct a yard check and failed to ensure that a trailer was unloaded. In June 2010, package handler Jeff Heisler,

---

[1]The facts are taken from the pleadings, the defendants' statements of undisputed facts, plaintiff's response thereto, and the evidence submitted in support. The facts are undisputed unless otherwise indicated.

complained about plaintiff's use of profanity towards him. During the investigation, plaintiff admitted that he used inappropriate language and did not handle the situation appropriately. Sword conducted a formal counseling session with plaintiff who "agreed with the corrective action steps discussed with [Sword] and [to] make sure that future conversations with package handlers are conducted in a professional and respectful manner." On August 17, 2010, plaintiff received performance counseling because he failed to conduct an accurate yard check to ensure all trailers were unloaded.

On August 10, 2011, Heisler complained again about plaintiff's temper and use of profanity. In order to verify Heisler's complaint, Sword spoke with other package handlers who confirmed that plaintiff engaged in yelling and the use of profanity. Sword conducted a formal counseling session and discussed the Acceptable Conduct Policy-010 with plaintiff. Plaintiff admitted that his inappropriate behavior had to stop and he said he would work on managing his temper. Sword advised plaintiff "that this and similar types of behavior would not be tolerated any longer and another report of a similar incident could and likely would result in termination under [Acceptable Conduct] Policy-010."

On June 29, 2012, package handler Jessica Taylor called Laura O'Neal in Human Resources ("HR") and filed a report regarding inappropriate text messages from plaintiff.[2] Taylor indicated that she wished to resign from her position because she did not want to work in an environment where she felt uncomfortable. O'Neal explained the Anti-Harassment and Anti-Discrimination Policy to plaintiff and he admitted that he had in fact sent text messages to Taylor. However, he claimed he was just trying to be friendly and to get to know her better. Plaintiff denied the purported content of the text messages, but admitted that he had seen Taylor working and his messages commented on how he admired what a hard worker she was. Plaintiff promised that he would be more mindful in the future about any contact outside of work with package handlers. Plaintiff received a written warning from Sword for violating the Anti-Harassment and Anti-Discrimination Policy-020. Plaintiff was advised that his failure to comply with policy may result in disciplinary action up to and including termination.

In September 2012, plaintiff received performance counseling because he failed to follow proper procedures for a yard check. As a result of his actions, a trailer with packages still inside sat in the station yard on September 27 and 28. On September 13, 2013, plaintiff received a written warning because he failed to report for his scheduled shift and failed to properly inform his manager or get approval for his absence. In September 2013, package handler Brianna Carroll reported that, she had heard plaintiff call another package handler a "homo," and that plaintiff said to him "go ahead and go to HR, I dare you." Carroll also indicated that plaintiff mocks people, talks behind their backs, and that plaintiff had been asking her for her phone number. Carroll reported that

---

[2]Taylor reported that she received a text message from plaintiff stating something like, "Guess Who?" Taylor didn't recognize the phone number and thinking it was one of her friends, responded: "My future baby daddy." The reply was: "Guess again, it's Corey [Scales]," followed by: "If only I was that lucky. You have no idea how much I watch you at work." Taylor then responded: "That's creepy." Plaintiff replied: "Don't look at it as creepy, I admire you." Taylor then advised plaintiff not to text her again. During his deposition, plaintiff admitted that he did text something to the extent of "you have no idea how much I watch you at work and that [I] admire you," and in response to Taylor's text: "is this my future baby daddy?" plaintiff admitted that he replied: "If only I was that lucky."

2

plaintiff made comments to her like "you seem interesting, I bet you're a real goody-goody," "I want to get to know you–the real you–outside of work." When interviewed, plaintiff admitted to calling a package handler a "homo," and that he told Carroll to put her phone number in his phone, but he claimed he was joking on both occasions. FedEx conducted interviews of other employees who confirmed that plaintiff often called people "homos" behind their backs. As a result, it was determined that plaintiff violated the Acceptable Conduct Policy-010 and the Anti-Harassment and Anti-Discrimination Policy-020. Plaintiff was advised that "an inability on [his] behalf to modify his behavior and conduct himself in a manner befitting that of a FedEx manager and/or any confirmed future reported incidents of this nature will result in termination of his employment with FedEx Ground." Given plaintiff's history of misconduct, he was also advised that he would be placed on a Performance Improvement Plan ("PIP").

On December 14, 2013, Olexa had a documented discussion with plaintiff due to his failure to turn in required paperwork and advised that a PIP may be initiated. On December 27, 2013, Olexa had a documented discussion with plaintiff due to his failure to properly scan packages which resulted in a rating of "less than satisfactory service."

On January 4, 2014, plaintiff was placed on a formal 90-day PIP focusing on improvement in: 1) communication skills including listening, presenting and conversing with managers, package handlers, and drivers; and 2) accountability including completing assigned duties promptly and with proper follow up. It was specifically noted that plaintiff's performance with respect to package handler interaction was:

> Less than expected or no communication with packager handlers on an individual basis regarding individual package handler performance; Complaints of harassment or hostile work environment for package handlers as documented in [his personnel records] . . . ; and [i]nappropriate comments made about package handlers and managers to others on dock and in office.

On January 18, 2014, Olexa had a documented discussion with plaintiff because he failed to follow the proper procedure to make an adjustment to an employee's time card which was a violation of time-keeping policy and an integrity issue. On February 12, 2014, Olexa had a documented discussion with plaintiff because he failed to inspect his assigned area, and after the delivery trucks had already been dispatched for the day, 22 packages were left behind in his assigned area.

At the end of the 90-day PIP in April 2014, plaintiff had made improvements, however, it was noted that plaintiff only did what was asked of him when he knew someone was watching him and the majority of the improvement he showed occurred in the last 30 days, if not the last 15 days, of the PIP. Consequently, a second 90-day PIP was initiated on April 15, 2014, to ensure plaintiff's improvements could be sustained.

In Olexa's annual performance review of plaintiff for the fiscal year June 1, 2013 to May 31, 2014, he noted "[plaintiff] has put a lot of time and effort into improving himself and that he had grown his skills and abilities," and gave plaintiff an overall rating for the year at 2.92 out of 5. A score of 3.00 means an employee has fully achieved results. Olexa noted significant improvements by plaintiff in May and the first half of June 2014.

3

During his time as an operations manager, plaintiff was advised that he should direct all FMLA inquiries by his package handlers to the toll-free telephone number for Aetna, FedEx's FMLA administrator. Moreover, after a package handler submitted a claim, Aetna would send an email to plaintiff titled: "Preliminary Designation Notification," and providing: "[Aetna] administers leave for [FedEx Ground] under the [FMLA]; the package handler had notified Aetna of his/her need to take leave; and Aetna advised the employee to have his/her health care provider to complete a form and return it to Aetna by a specific deadline."

According to plaintiff, he discussed his need for hip surgery and the length of time he would be out of work with Olexa and Sword in June 2014. On June 7, 2014, plaintiff sent the following email to Kirby Reinhardt in HR regarding medical leave:

> My doctor has scheduled me for hip replacement surgery for Monday, July 7, 2014. My doctor has advised me that the expected recovery time is 6 to 8 weeks, during which time I will be unable to work. Please advise me what medical information is required to be submitted by my doctor to FedEx regarding this matter.
>
> From previous conversations with Laura O'Neal, I am aware that there are no short-term medical benefits available to me because I am not a full-time employee of FedEx; however, am I able to use unaccrued vacation time for the 2014 fiscal year? If so, please advise how much I can use so I can determine if I want to use this option.

Reinhardt responded on June 10, 2014, "Sorry for the delayed response. I had to research a bit. You may schedule all your vacation (that you would accrue for FY15) to cover the time off during recovery." On June 11, 2014, plaintiff replied, "Thanks. What medical documentation needs to be submitted by my doctor?" Reinhardt responded the same day, "You will need to call Aetna to initiate an FMLA claim first. Please use the attached document." The header on Reinhardt's June 11, 2014 email clearly indicated there was an attachment identified as "Family and Medical Leave Act Request.HMR-440.pdf." On June 12, 2014, plaintiff replied, "Thanks for the info."

At his deposition, plaintiff testified that he did not recall receiving a document attached to Reinhardt's email. Plaintiff testified that he did not call Aetna's toll-free number that he had previously given to his package handlers that inquired about FMLA because he was under the assumption that the FMLA guidelines for package handlers were different than those for managers. Plaintiff admitted that he did not even attempt to call Aetna to inquire if the same procedure applied to managers. The FedEx Ground Family Medical Leave Act Request HMR-440 states: "In order to initiate the FMLA eligibility and approval process, an employee must immediately contact FedEx Ground's third party administrator (Aetna) at 1-866-464-7686, option 9 or via the [HR] Portal" (located on FedEx Ground's intranet website).

On June 20, 2014, Sean O'Conner, in the FedEx Ground's Contractor Relations Department, received an anonymous letter regarding a number of issues at the Rockford station. Among other things, the letter stated that package handlers were being cussed at, spoken down to, harassed, and that "[o]ne manager likes to walk around and try to intimidate people" and "another manager thinks they [sic] can go around and bully people to do things their way. This manager has been turned in several times because of their [sic] attitude and the way they [sic] talk down to workers."

4

Reinhardt initiated an investigation into the assertions in the anonymous letter on July 1, 2014. She interviewed a number of package handlers including Patrick Rand who reported that he heard plaintiff call an Asian package handler "Slant Eyes," and once plaintiff told Rand, "you should probably go kill yourself," but it was all in good fun. Gianna Tran reported that plaintiff refers to her as "Egg Roll" because she is Asian. Sandra Hamilton reported that plaintiff calls people by their ethnicities instead of their names such as "Hey Eggroll" and "Hey Slant Eyes." Hamilton also said that plaintiff calls Middle Eastern or Indian employees "Hey Abeb" and "Hey Hodgie," and he "swears all the time at package handlers." Reinhardt found that plaintiff violated the Acceptable Conduct Policy-010 by calling package handlers ethnically derogatory names; cussing at the package handlers he supervised; and telling a package handler to go kill himself. Reinhardt also found that another operations manager, Davaki Redmon, cussed but did not direct it at package handlers and the package handlers reporting to her did not feel bullied. Reinhardt found that Redmon violated the Acceptable Conduct Policy-010 and proposed that a Documented Discussion be held with Redmon.

Reinhardt conducted further interviews on July 1, 2014, based upon an email she received from Redmon concerning plaintiff's actions. Redmon reported that Rachel Miller-Larson indicated that when she was a package handler, plaintiff flirted with her and asked her out on dates which made her very uncomfortable. Miller-Larson also witnessed plaintiff touching Tran and inappropriate closeness between plaintiff and Tran. Miller-Larson said that plaintiff called a package handler of Indian decent "Abeb" and another "Hodgie," and she heard plaintiff tell Rand to "go kill himself." Miller-Larson also advised that it was rumored among employees that plaintiff and Tran were in a sexual relationship and that plaintiff gave Tran money. Tran denied any sexual or inappropriate relationship with plaintiff, that plaintiff had inappropriately touched her, flirted with her, sent her inappropriate texts, or gave her money. Tran acknowledged, however, that she communicated with plaintiff outside of work, but only about work topics.

When Sword and O'Neal interviewed plaintiff on July 1, 2014, plaintiff admitted calling Tran "Egg Roll" because Tran stated that she had been called that at her previous job. He denied any sort of relationship with Tran, touching her, or giving her money, and denied telling Rand to "go kill himself" and flirting with Miller-Larson. Plaintiff was put on paid suspension on July 1, 2014, pending the final outcome of the investigation. Olexa spent a good deal of time instructing plaintiff during his PIP and never observed any inappropriate interaction between plaintiff and the package handlers.

Based on the entire investigation, Reinhardt determined that she could not substantiate that plaintiff had a sexual relationship with Tran, gave her money, or inappropriate actions with respect to Miller-Larson. However, there was sufficient corroboration that plaintiff touched Tran inappropriately and communicated with her outside of work, that he called package handlers by ethnically derogatory names, and that he told Rand to "go kill himself." As a result, Reinhardt concluded that plaintiff had violated the Acceptable Conduct Policy-010 and the Anti-Harassment and Anti-Discrimination Policy-020, and she submitted him for termination review.

Reinhardt's investigation was reviewed by her manager, the Corporate Case Manager, the Regional Managing Director of Operations, and the FedEx Legal Department. There were no objections made during plaintiff's termination review process, and at the conclusion of the process

5

Sword made the decision to terminate plaintiff. Sword phoned plaintiff on July 29, 2014, and advised him of his termination due to misconduct. Plaintiff had his hip surgery the day before on July 28, 2014.

In his first amended complaint, plaintiff brings a claim for "compensatory damages under the FMLA" alleging that he informed Sword and Olexa that he would be having hip surgery in July 2014, and he had an entitlement to leave under the FMLA. Plaintiff alleges further that by placing him on administrative suspension and then terminating him, FedEx deprived him of leave in violation of the FMLA. In more detail, plaintiff claimed during his deposition that part of the reason he was terminated was because Sword was upset that he was going to be off of work for 6-8 weeks and this would have a negative impact. Additionally, plaintiff claims he would not have been available to do the pre-planning for the peak holiday season. However, plaintiff admitted that he would have been back at work for the peak season itself which begins the week after the Thanksgiving holiday.

## II. ANALYSIS

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists and summary judgment is inappropriate if there is sufficient evidence for a jury to return a verdict for the nonmoving party. Springer v. Durflinger, 518 F.3d 479, 483 (7th Cir. 2008). Summary judgment is mandated, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). For the purposes of a motion for summary judgment, the court must look at the evidence in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

The FMLA prohibits "interfere[nce]" with the exercise of FMLA rights, 29 U.S.C. § 2615(a)(1), "discriminat[ion] against any individual for opposing any practice made unlawful by this subchapter," id. § 2615(a)(2), and "discriminat[ion] against any individual because such individual–(1) has filed any charge, or has instituted or caused to be instituted any proceeding, under or related to this subchapter; (2) has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under this subchapter; or (3) has testified, or is about to testify, in any inquiry or proceeding relating to any right provided under this subchapter," id. § 2615(b). Despite the textual references to discrimination, the courts have generally characterized the two types of FMLA claims as interference and retaliation. See Pagel v. TIN Inc., 695 F.3d 622, 626 (7th Cir. 2012) ("Employers are prohibited from both interfering with and retaliating against an employee's use or attempted use of FMLA leave."(citations omitted)); see also Shaffer v. Am. Med. Ass'n, 662 F.3d 439, 443 (7th Cir. 2011) ("There are two types of FMLA claims, those for interference and those for retaliation.").

### A. FMLA Interference

"The burden to prove FMLA interference lies with the plaintiff-employee." Simpson v. Office of Chief Judge of Circuit Court of Will Cty., 559 F.3d 706, 712 (7th Cir. 2009). To survive summary judgment on his FMLA interference claim, plaintiff must identify evidence creating a

genuine dispute of material fact that: "(1) he was eligible for the FMLA protections; (2) his employer was covered by FMLA; (3) he was entitled to take leave under FMLA; (4) he provided sufficient notice of his intent to take leave; and (5) his employer denied him FMLA benefits to which he was entitled." Curtis v. Costco Wholesale Corp., 807 F.3d 215, 223 (7th Cir. 2015) (alterations omitted)). FedEx argues that plaintiff has not done so with regard to the fifth element because he cannot show that he was denied FMLA leave to which he was entitled as he never initiated a FMLA claim. The court agrees.

At the summary judgment stage, plaintiff must raise a genuine issue of material fact regarding his entitlement to FMLA leave. Darst v. Interstate Brands Corp., 512 F.3d 903, 908 (7th Cir. 2008). An employee does not become entitled to FMLA leave until and unless he follows claims procedures. 29 C.F.R. § 825.302(d) ("An employer may require an employee to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances."). An employee's failure to comply with his employer's internal leave policies and procedures forecloses an FMLA claim. Nicholson v. Pulte Homes Corp., 690 F.3d 819, 825 (7th Cir. 2012); Brown v. Auto. Components Holdings, LLC, 622 F.3d 685, 690-91 (7th Cir. 2010).

In this case, it is undisputed that plaintiff never contacted Aetna, FedEx's third party FMLA administrator, in order to initiate the FMLA eligibility and approval process as the FedEx policy requires. Moreover, there is no evidence in the record before the court that FedEx interfered with any attempt by plaintiff to request FMLA leave. On the contrary, the only evidence is that on June 7, 2014, plaintiff notified HR about his upcoming hip replacement surgery and on June 10 & 11 Reinhardt gave him instructions on how to request medical leave. The anonymous letter was received almost two weeks later on June 20, 2014, the investigation leading to plaintiff's suspension did not occur until July 1, 2014, and plaintiff was not terminated until July 29, 2014. Consequently, there was ample time to make an FMLA claim if that was really what plaintiff wanted to do and no evidence that FedEx interfered with plaintiff's ability to do so.

Plaintiff claims that he "did not recall" receiving the Aetna FMLA leave request form that was attached to Reinhardt's June 11, 2014 email. However, the only evidence is that plaintiff responded to that email, which expressly referenced the attachment in both the email's header and in its text, by writing "Thanks for the info." Nevertheless, there is evidence in the record that plaintiff was well aware of the procedures for initiating and substantiating a claim for FMLA leave through Aetna. It is undisputed that, as an operations manager, plaintiff was responsible for directing FMLA inquiries by the package handlers he supervised to Aetna's toll-free number. It is also undisputed that when one of his package handlers submitted an FMLA claim to Aetna, plaintiff would receive an email from Aetna indicating, among other things, that the package handler was advised that his or her health care provider needed to complete a form and return it to Aetna by a specific deadline.

Plaintiff testified that he thought there was a different procedure for managers to initiate and substantiate FMLA claims than there was for package handlers. However, plaintiff failed to explain why he so thought. Nevertheless, even if it is true that plaintiff did not recall getting the attachment to the email and truly thought that managers followed a different procedure for requesting FMLA, plaintiff does not deny that Reinhardt told him he needed to initiate the claim with Aetna and

7

defendant's own words demonstrate his understanding that he would need to provide some information from his doctor in order to substantiate his requested medical leave. See 29 U.S.C. § 2613(a) (providing that the FMLA permits an employer to require that a request for leave due to a serious health condition be supported by certification issued by the health care provider of the employee). Despite this understanding, it is undisputed that defendant never provided any medical information and made no effort to request medical leave. Under these circumstances, FedEx had no way of verifying that plaintiff actually needed hip replacement surgery, when the surgery would take place, or how long plaintiff would need to be absent from work in order to recover. For these reasons, there is no genuine issue of material fact as to whether FedEx denied plaintiff FMLA benefits to which he was entitled. Therefore, FedEx is granted summary judgment on plaintiff's FMLA interference claim.

### B. FMLA Retaliation

The FMLA provides that it is unlawful for any person to "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). To sustain a FMLA retaliation claim, plaintiff must show "(1) he engaged in a protected activity; (2) his employer took an adverse employment action against him; and (3) there is a causal connection between the protected activity and the adverse employment action." Pagel v. TIN Inc., 695 F.3d 622, 631 (7th Cir. 2012). Claims of discriminatory/retaliatory discharge under the FMLA are analyzed in the same manner as retaliatory discharge claims under other employment statutes, such as Title VII and the ADA. See Buie v. Quad/Graphics, Inc., 366 F.3d 496, 503 (7th Cir. 2004).

The parties frame their arguments around the direct and indirect methods of proof. However, the Seventh Circuit in Ortiz v. Werner Enterprises, Inc., has instructed "that district courts must stop separating 'direct' from 'indirect' evidence and proceeding as if they were subject to different legal standards." 834 F.3d 760, 765 (7th Cir. 2016). The court in Ortiz made clear, however, that:

> The burden-shifting framework created by McDonnell Douglas Corp. v. Green sometimes is referred to as an indirect means of proving employment discrimination. Today's decision does not concern McDonnell Douglas or any other burden-shifting framework, no matter what it is called as a shorthand. We are instead concerned about the proposition that evidence must be sorted into different piles, labeled "direct" and "indirect," that are evaluated differently. Instead, all evidence belongs in a single pile and must be evaluated as a whole.

Id. at 766 (citation omitted). Thus, the "legal standard . . . is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [inquiry about taking FMLA leave] caused the discharge." Id. at 765.

FedEx argues that plaintiff has presented insufficient evidence to establish a genuine issue of material fact that there was a causal connection between his FMLA inquiry and the termination of his employment. In response, plaintiff argues that the record evidence clearly establishes a causal connection:

> Plaintiff advised FedEx of his impending surgery formally by email to Reinhardt on

June 7, 2014. An anonymous letter comes into FedEx Ground Contractor Relations Department concerning treatment of package handlers at the Rockford station. An investigation is conducted on July 1, 2014 that results in the charges leading to the Plaintiff's discharge. Plaintiff was at the end of a PIP that started at 90 days and was extended by an additional 90 days. His supervisor, who had been closely observing Plaintiff during the PIP, had not observed any of the conduct Reinhardt substantiated after her investigation on July 1, 2014. Finally, Olexa, Plaintiff's immediate supervisor, who was monitoring the Plaintiff during the disciplinary, was not interviewed during the July 1, 2014 investigation and his input was not sought as to whether to discharge Plaintiff.

FedEx, perhaps out of an abundance of caution, gleans a suspicious-timing argument from this paragraph. The court does not find such an argument to be adequately advanced but, in any event, the Seventh Circuit has made clear that "temporal proximity between an employee's protected activity and an adverse employment action is rarely sufficient to show that the former caused the latter." O'Leary v. Accretive Health, Inc., 657 F.3d 625, 635 (7th Cir. 2011); see also Harden v. Marion Cty. Sheriff's Dep't, 799 F.3d 857, 862 (7th Cir. 2015) ("Temporal proximity between an employee's protected activity and an adverse employment action is rarely enough to show causation."). Nevertheless, the timing of plaintiff's termination in this case is not suspicious because plaintiff was nearing the end of his second 90-day PIP–due to a disciplinary history going back to 2010 for using profanity at package handlers, inappropriate communications with female package handlers, and calling package handlers by offensive names such as "homo"–when he inquired about FMLA medical leave on June 7, 2014. The July 1, 2014, investigation into the claims asserted in the June 20, 2014 anonymous letter only provided evidence that plaintiff's performance was not improving despite the PIP. Instead, it is undisputed that the investigation revealed that plaintiff was calling Asian package handlers "Slant Eyes" and "Egg Roll," Middle Eastern package handlers "Abeb" and "Hodgie," and continued to flirt with one female package handler and had now began to inappropriately touch another. Although plaintiff's FMLA inquiry and his termination were less than two months apart, the undisputed evidence of plaintiff's long history of misconduct and continued misconduct during his PIPs would not permit a reasonable jury to find a causal connection between plaintiff's FMLA activity and FedEx's decision to terminate his employment. See Buie, 366 F.3d at 509 ("[G]iven Buie's myriad problems at work, a reasonable jury could not conclude from timing alone that Quad/Graphics suspended or fired Buie because of his announcement that he had AIDS and, implicitly, because he would thus be requesting benefits under the FMLA.").

Plaintiff asks: "[i]f the Plaintiff was using ethnically derogatory names on the dock wouldn't Tim Olexa have observed that at least once during his intense observation of the Plaintiff from January through June 2014?" The obvious answer is, not necessarily. In fact, it is not surprising that Olexa did not observe any misconduct because plaintiff would no doubt avoid using racially derogatory names and engaging in other inappropriate behavior in the presence of a supervisor while under a PIP. In any event, Olexa's lack of observation of plaintiff's misconduct is not evidence that plaintiff's termination was causally connected to his FMLA inquiry because that circumstance does not eliminate the evidence of plaintiff's on-going misconduct that was revealed during Reinhardt's July 1, 2014 investigation of the anonymous letter. Nor does the fact that Olexa was not interviewed on July 1, 2014, call into question the misconduct reported that day by various package handlers.

It is undisputed that package handlers reported misconduct on plaintiff's part that was in violation of the FedEx Ground Acceptable Conduct Policy and the FedEx Ground Anti-Harassment & Anti-Discrimination Policy which constituted grounds for his termination. It is undisputed that plaintiff even admitted to calling Tran "Egg Roll" during the July 1, 2014 investigation.

Finally, in apparent recognition of the still-intact burden-shifting method of proving causation, plaintiff argues that FedEx has offered no evidence that plaintiff would have been terminated regardless of any retaliatory motive. The court disagrees. The evidence does not even support a prima facie case of FMLA retaliation but, assuming for the sake of argument that it did, there is ample evidence of plaintiff's misconduct warranting the decision to terminate his employment and insufficient evidence that the reasons given, plaintiff's violation of FedEx's Acceptable Conduct Policy and FedEx's Anti-Harassment and Anti-Discrimination Policy, were pretextual. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 804 (1973). Because plaintiff has failed to advance sufficient evidence that would permit a reasonable factfinder to conclude that there was a causal connection between the termination of plaintiff's employment and his inquiry about taking FMLA leave, summary judgment for FedEx on plaintiff's FMLA retaliation claim is also appropriate.

### III. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

Date: 1/24/2017          ENTER:

_____
FREDERICK J. KAPALA

District Judge